JAMES D. CARTON, complainant,

*v.*

MORRIS EICHENGREEN and EICHENGREEN LAND COMPANY, INCORPORATED, a corporation, defendants.

[Decided December 6th, 1926.]

Evidence analyzed, and *held,* that the case is not within the doctrine, that "He who undertakes to act for another in any manner of trust or confidence shall not in the same manner act for himself against the interest of the one relying upon his integrity."

---

*Messrs. McCarter & English (Mr. Robert H. McCarter),* for the complainant.

*Mr. Merritt Lane,* for the defendants.

BACKES, V. C.

The complainant, Carton, owned the tax title in fee, unforeclosed, to eighteen acres of land in Neptune City, Monmouth county. He claims to have had an agreement with the owners, McNulty and the Gulicks, to buy their estates for $2,500 each, and that the defendant, through its president, Eichen-

green, agreed to purchase the tract from him for $25,000, upon his title being perfected. He further claims that he accepted Eichengreen's offer to see the owners, in order to speed up the conveyances by them to complainant, so that the agreement with Eichengreen could be carried out, but that Eichengreen double-crossed him, and instead, purchased the tract from them and had it conveyed to his, the defendant, company. It is charged that Eichengreen's conduct was fraudulent, and that in the circumstances he could not acquire any title or interest in the land "in derogation of the rights of the complainant therein" (meaning, presumably, his contract with the owners). The prayer is that, upon reimbursement, it be declared that the defendant company holds the property in trust for the complainant, and that the defendant be decreed to convey it to him. In his brief the complainant rests his case upon the principle that Eichengreen was engaged, and had undertaken to procure the title for the complainant, and that it was a violation of his trust to secure it for himself, and *Rogers* v. *Genung, 76 N. J. Eq. 306,* is relied upon. The doctrine there laid down is "that he who undertakes to act for another in any manner of trust or confidence shall not in the same matter act for himself against the interest of the one relying upon his integrity."

The history of the case, as disclosed by the evidence, is that the title was in litigation from 1910 until after 1916 (*Bennett* v. *Platt, 85 N. J. Eq. 436; affirmed, Ibid. 602*), and in this litigation the complainant represented the McNulty and Gulick interests as solicitor. In the early stages of the litigation, and almost yearly thereafter, the property was sold for taxes, sometimes for a term of years and other times in fee. Except for the first year, 1911, the complainant was the purchaser, and for that year the sale certificate was assigned to him by the purchaser. His total investment was approximately $4,000. He was moved to do this at first to protect his clients, and later to save himself. Under his deeds, the complainant was entitled to, and took, possession, and in later years was reputed to be the owner of the property, which he was at no pains to dispel. Eichengreen,

who had developed two adjacent tracts and was intent upon extending his operations to this property, was of that opinion. He knew who the owners had been, for in 1911 he had an option to purchase from McNulty and the Gulicks, and attempted to foreclose it by bill (Docket 34-262), but had the impression that Carton had acquired their interests, and this he felt was confirmed when he learned that Carton and wife had given a deed to the town for a strip of land to widen a street. After a call or two and offers by Eichengreen, first of $20,000, then $22,500, Carton says that in March, 1922, he, Carton, agreed, but declined to commit himself in writing, to let him have the property for $25,000 upon getting in the outstanding interests, either by purchase or by foreclosure of his tax liens, and that Eichengreen accepted. Eichengreen's version is that Carton represented that he had acquired all the outstanding interests except a small share, and that he offered $20,000; that Carton wanted $25,000, and that the nearest approach to a bargain was Carton's promise to sell the property to him when he got in the remaining interest, which he said would be within thirty days, and that then they would "make a deal and close it up." There was no doubt some loose understanding to sell in the future either for $20,000 or $25,000, but there can be no question that Carton did not regard himself as bound to Eichengreen, for in April he wrote the attorney of the McNulty interest, in an effort to buy that interest, that "to date I have been unable to make any disposition of the same," which was literally, but disingenuously true; and in March of the following year, in answer to an importuning letter from Eichengreen, he wrote, "I have not yet completed my matter sufficiently to enable me to take up with you the negotiation for the property about which you spoke to me, but hope to within a short time." Eichengreen was anxious to buy, and in a letter to Carton a few days after his offer spoke of the property as "purchased" by him, which, it is argued, evinces that an agreement had been reached, but, it would appear, that that referred to the only thing definitely arrived at, that Carton would sell to Eichengreen when he had cleared up his

title. Their testimony is in agreement as to that, but not as to the price, which Carton says was $25,000, while Eichengreen says Carton wanted that sum but that his offer was $20,000. The purchase price was held in abeyance until Carton was in a position to give title. Upon this phase of the case the situation is conceived to be that Carton did not consider himself bound beyond driving the best bargain he could with Eichengreen when the time arrived, and that he was free to bargain for better terms with others if opportunity presented itself. His disinclination to give written evidence of the understanding, his letter just quoted, and his later indifferent conduct, to be presently commented upon, all strongly indicate his attitude that he was not committed to Eichengreen.

In 1914 Carton had negotiated with the owners, and had a contract with the Gulicks, which the McNulty interest refused to sign. The contract was not to be executed until the litigation involving the title was out of the way. Nothing came of it, and all negotiations ceased in 1916. They were revived in 1921. By that time the McNulty interest had passed to his widow and then to his daughter, represented by one Morehouse and later by one Ronon, and the Gulick interests were held by five parties, represented by their attorney, Lawrence. In that year Carton opened correspondence with Lawrence, and in 1922 with Morehouse, and to the latter, by way of introduction, stated his desire for the address of Miss McNulty, and harking back to Morehouse's letter to him of June 16th, 1916, recalled that the writer had there stated that Mrs. McNulty would sell her interest for $4,000, less taxes and interest. Morehouse referred him to Ronon, his successor. From that time on until August, 1923, there was desultory correspondence between Carton and the two lawyers, all plaintiff on the part of Carton, that the margin between his investment and the value of the property was narrow, and that something had to be done to reimburse him, and salvage a little out of the wreck for themselves, or he would have to foreclose to save himself. His letters were as from one discouraged, and while their tone

was urgent that they relieve him, and also solicitous that they save what they could for themselves, there was always subtle suggestion that the prospects were not bright. He never let out a peep that he had an offer of $20,000 or $25,000 from Eichengreen. On August 16th, 1923, Lawrence wrote asking if he would give $2,500 for the Gulick interest, and if so he would forward deeds to his clients for execution, and on the 17th Carton answered: "You suggest that I agree to pay $2,500 for one-half interest in the property. In view of what I already have in the property and the large outstanding claim against it, the figure is high and I am sure more than the interest would amount to. However, I appreciate that because there are so many parties in interest with whom it would have to be divided and so that your suggested fee may be taken care of, I am, without prejudice, willing to make you this offer at this time," &c. Lawrence was away on vacation but acknowledged receipt on the 24th, and on the 29th promised prompt attention on his return, and it was about that time that Eichengreen bought for $3,500. On August 23d, 1923, Carton wrote to Ronon, after some letters leading up to it: "However, and without prejudice, I am willing to make your client an offer of $2,000 for one-half interest in the property, which I consider is a very fair one, and I wish you would let me know at your early convenience if it is accepted or not. If it is not I must take some steps to protect my own interest under my tax title." Carton says a few days later, over the phone, he raised the figure to $2,500, which, he claims, was accepted, but the correspondence indicates that he is mistaken. In the meantime Eichengreen stepped in and purchased from McNulty for $2,500. The documentary evidence clearly shows that in March, 1922, at the time of the alleged agreement between Carton and Eichengreen, there were no contracts between Carton and the owners of the equity of redemption, and if there were any later, there was none that Eichengreen was bound to take notice of before he purchased. Carton had no right or interest in the land in this respect which he, in his bill, alleges was threatened to be "derogated" by the title acquired by the defendant.

From March, 1922, to August, 1923, Eichengreen called upon Carton a score of times to inquire as to the progress he was making to clear up the title (he was of the impression that a fractional interest was yet to be secured) and to urge it along, and each time was put off with a hopeful promise of an impending adjustment until his impatience reached a critical point, and, according to Carton, he came to his office in the middle or latter part of August, 1923, "for a show-down, apparently." (He says he thought that it was before his offer to Ronon of August 23d, and after his offer to Lawrence of August 17th.) Before that, Carton says, on two or three occasions, when Eichengreen was insistent, he, Carton, had told him: "He didn't want to be bothered with it, that he was busy with other things, and if he didn't want to carry out his agreement, they would abandon the thing; that he would take his own time to fix it up." At the August meeting, so Carton says, Eichengreen, threatening and importuning in turn, was told in some detail about the efforts he was making, and was given the names and addresses of the lawyers and of the parties, and was shown a letter from Lawrence giving that information; that Eichengreen took the names and addresses of Lawrence and Ronon, suggesting that he might see them, and then, as Carton says: "I told him it was not necessary to go to see them, that I had about concluded the matter, but I did tell him during the conversation, if he could do any better, if he could hurry the thing faster, go on and hurry it up himself," and, Carton adds, "It turned out after that that is exactly what he did." Carton characterizes his remark as "foolish," that it was meant only to appease Eichengreen; that Eichengreen was not to call on the parties; that there was no agreement (understanding) that he would; that he did not agree to it, and that he certainly did not expect him to see them, and that he simply suggested that "if he could speed this up and make these people move faster than I am 'you can do it yourself.' " The remark was not a request, but a defiance, and, as Carton says, made with some asperity. Upon this assumed state of facts it is observed that there was neither authorization by

Carton nor assumption by Eichengreen to act for Carton. In fact, Carton seems to resent the imputation that there was. There was no agency nor trust relation, either express or implied, and, obviously, this state of facts does not bring the case within the doctrine of *Rogers* v. *Genung*.

But Eichengreen tells a different story. Carton claims he knew he had but a tax lien; that he had told him so, and that the entire equity of redemption was still in McNulty and the Gulicks. It is hardly likely that Eichengreen, who had some familiarity with real estate matters, would have treated with Carton as the owner had he known he had but a lien, and his story that he thought Carton owned all but a fragment or two commends itself as the more reasonable of the two. Eichengreen denies that he sought, or that Carton gave him, the information, or that he offered to, or was directed to, see the parties to hurry the matter along, as related by Carton. He knew as well as Carton who the owners were, or might be, for he had had an option from them and he had called upon Miss McNulty and Ronon, her lawyer, two years before to negotiate a purchase. It was because Ronon failed to reply to his follow-up letter, and Carton's deed to the town for a strip of the land, that he had assumed that Carton had acquired her interest. The thing that excited his attention at the August meeting, he says, was Carton's remark that a holder of one of the interests was in California, whereas he had previously said he lived in Massachusetts. He consulted his lawyer and they had the title searched and found that McNulty and the Gulicks were still the record owners, and Carton only the holder of a tax lien. Eichengreen hied himself to Philadelphia, and, after getting the house address of Miss McNulty out of the directory, telephoned his lawyer to come on. He also got in touch with Mrs. Houseright-Johnson, in Mt. Vernon, New York, who referred him to her lawyer, Lawrence. Mrs. Houseright-Johnson at one time owned the Gulick half interest and with McNulty had given Eichengreen the option, which, as already told, he tried to enforce by suit. She later conveyed half of her share to the Gulicks, which later came to those with whom Carton was

angling and from whom Eichengreen purchased. The rest of the story is mostly told by Eichengreen's lawyer, Charles Jones, of Newark. Jones says he, too, was of the opinion that Carton owned the property, and that it was upon his suggestion that Eichengreen approached Carton to buy it, and that when Eichengreen reported Carton's discrepancy in the party's address he dispatched him to a searcher in Freehold for an examination of the records, and upon learning the result, and receiving the telephonic call from his client, he went to Philadelphia and met Miss McNulty and Ronon at her home. A week later Jones called Ronon on the phone and they closed the deal. Jones says he learned of Lawrence independently of Eichengreen, and he explains how, and negotiated with him and purchased. Upon the issue of fact, whether Carton divulged to Eichengreen the names and addresses of the lawyers and owners, with direction to see them in his behalf, and that he took advantage of the confidence, all that need be said is, that Carton's affirmation is met by Eichengreen's denial, and that the burden of proof is on the complainant, which he has not sustained. It may not be amiss, however, to observe that in the race to the swift, Eichengreen was not disqualified, though Carton manipulated the stake and jockied into position to capture it himself.

The point made by the defendant that Carton was not entitled to be heard to complain of the defendant's conduct because of his own alleged unconscionable dealings with the owners of the equity of redemption, towards whom it is claimed he still bore the confidential relation of attorney and client, is not well founded. The relation was with their predecessors and had long since ceased, and he dealt with them at arm's length, and with their attorneys. Although the criticism of his methods with them reflects upon his integrity as a witness it is not justly addressed to professional relationship.